UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALBONA LUCAJ and
SEBASTIANO QUAGLIATA,

                    Petitioners,                    No. 12-cv-12780-DT

vs.                                                 Hon. Gerald E. Rosen

MICK DEDVUKAJ, Detroit District,
Director, United States Citizenship and
Immigration Services, et al.,

                    Respondents.
_____/

OPINION AND ORDER REGARDING
MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on March 31, 2014

PRESENT:Honorable Gerald E. Rosen
United States District Chief Judge

## I.  INTRODUCTION

        This matter is presently before the Court on the Motion filed by Valbona Lucaj

and her husband, Sebastiano Quagliata, for summary judgment on their petition for

review of the denial of their applications for naturalization.  Respondents have filed an

Opposition Brief, which the Court will treat as a cross-motion for summary judgment.[1]

_____

        [1]  The parties were notified on March 14, 2014 of the Court's intent to treat
Respondents' Opposition Brief as a cross-motion for summary judgment and afforded

1

Having reviewed the parties' briefs, the accompanying exhibits, and the record as a

whole, the Court finds that the pertinent facts and legal contentions are sufficiently

presented in these materials, and that oral argument would not assist in the resolution of

this matter.  Accordingly, the Court will decide this matter "on the briefs."  *See* Eastern

District of Michigan Local Rule 7.1(f)(2). This Opinion and Order sets forth the Court's

ruling.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On January 18, 1997, Valbona Lucaj, a native of Albania, entered the United

States using fraudulent documents.[2]  Shortly thereafter, Lucaj filed an application for

asylum with the United States Citizenship and Immigration Service ("USCIS")[3] claiming

persecution on account of her religion.  Lucaj's husband, Sebastiano Quagliata, a native

of Italy, also applied for asylum as a derivative beneficiary of his wife's immigration

status.

Lucaj was interviewed for asylum status on May 6, 1997 by Asylum Officer

─────────────────────

Petitioners an opportunity to respond and they did, in fact, file a response on March
24,2014.

[2]  Lucaj's husband, Sebastiano Quagliata, an Italian citizen, entered the United
States approximately one month before his wife, on December 11, 1996, as a tourist.

[3]  At the time when Lucaj applied for asylum, the Immigration and Naturalization
Service ("INS") was the agency that performed these functions.  INS was abolished by
the Homeland Security Act of 2002, Pub. L. 107-296, and the agency was divided into
three components within the newly formed Department of Homeland Security on March
1, 2003.  USCIS took over the functions pertinent to this matter.  For the sake of clarity,
the Court will refer to both the INS and the USCIS as "USCIS" throughout this Opinion.

Delores Filandro at the USCIS's  New York Asylum Office.  *See* Declaration of Patricia A. Menges, Director of the New York Asylum Office, ¶ 15. During the interview Lucaj made a number inconsistent statements.  These statements were memorialized in an Assessment and Referral Memo [Respondents' Ex. A] prepared by AO Filandro for the referral of Lucaj's application to an Immigration Judge for placement of Lucaj into removal proceedings.  *See* Menges Decl., ¶¶ 9-10.  Notwithstanding the interviewing officer's credibility assessment and decision to refer Lucaj's application to the Immigration Judge, on May 20, 1997, Supervisory Asylum Officer John Shandorf changed the decision to refer Lucaj for removal to a "Recommended Approval," pending fingerprint results.  *Id.*, ¶ 18. When fingerprints cleared and indicated no known criminal or immigration-related offenses, SAO Shandorf entered a new final decision in the Refugee and Asylee Processing System ("RAPS") database, and on June 17, 1997, granted both Valbona Lucaj and her husband asylum.

A subsequent investigation found that Shandorf had been accepting bribes in exchange for granting asylum applications.  On November 17, 1998, the FBI arrested Luigi Berishaj, an individual who was discovered to have collected money from a number of asylum applicants which he paid Shandorf to secure political asylum for the applicants.  Berishaj's and Shandorf's activities were summarized in FBI witness interview reports ("302s") and witness statements.  *See* Defendants' Supplemental Exhibits in Support of Defendants' Opposition to Plaintiffs' Motion for Summary

Judgment, Dkt. # 29.  *See also*, *Stolaj v. Holder*, 577 F. 3d 651(6th Cir. 2009):

> From in or about mid-1996 until September, 1997 [Luigi] Berishaj made cash payments to Shandorf in connection with approximately twenty cases. Each time Berishaj paid Shandorf between $1,500 and $2,000. In exchange for these payments, Shandorf agreed to provide assistance in securing political asylum for these individuals.

 *Id.* at 653.

 Luigi Berishaj named19 asylum applicants who paid him $2,000 - $3,000 to obtain political asylum.  *See* Defendants' Supp. Exhibits, 12/8/98 FBI 302, Dkt. # 29-1, Pg. ID 242; 245.  He stated that he "kept a portion of the money (either $500 or $1000) and gave the remainder to John Shandorf.  Shandorf in turn arranged for political asylum to be granted to the [identified] individuals."  *Id.* at 242.  Berishaj specifically told the FBI that Valbona Lucaj was one of these applicants and that she paid $3,000 to obtain political asylum.  *Id*.   Berishaj also had Valbona Lucaj's name, address and phone number in his address book.  *Id*., Pg. ID 246-247.

Berishaj subsequently pled guilty to paying bribes to Shandorf in exchange for granting the asylum applications of a number of Albanian applicants, in violation of 18 U.S.C. § 201(b)(1)(A).  *See, United States v. Berishaj*, E.D.N.Y. No. 99-cr-00201.[4] Shandorf was indicted and tried before a jury.  *See, United States v. Shandorf*, E.D.N.Y.

---

[4]  "[A] federal court may take judicial notice of the proceedings in other courts of record." *Rodic v. Thistledown Racing Club, Inc*., 615 F.2d 736, 738 (6th Cir.1980), *cert. denied*, 449 U.S. 996 (1980); *see also Landt v. Farley*, 2012 WL 4473209, at *1 (N.D. Ohio Sept.26, 2012) (noting that the "court may take judicial notice of matters of public record, including duly recorded documents, and court records available to the public through the PACER system and via the internet.") (quotation marks and citation omitted).

No. 00-cr-00049.  During the trial, Berishaj and two other middlemen testified against

Shandorf.  *See United States v. Shandorf*, 20 F. App'x 50, 51 (2nd Cir. 2001).  On

January 22, 2001, Shandorf was convicted on 22 counts of conspiracy and bribery, in

violation of 18 U.S.C. §§ 371 and 201(b)(2)(A).  *Id.*[5]

Meanwhile, based on their grant of asylum, on June 4, 1998, Lucaj and Quagliata

applied for lawful permanent resident ("LPR") status, as permitted by 8 U.S.C. §1159(b),

and they were granted an adjustment to LPR on April 17, 2003, made retroactively

effective as of April 17, 2002.

Two years after being granted LPR status, on August 5, 2005, Petitioners received

a "Notice of Intent to Terminate Asylum Status" ("NOIT") from the Department of

Homeland Security ("DHS").[6]  The NOIT notified Petitioners:

---

[5]  Although several asylum applicants were also criminally charged and convicted based on their participation in Shandorf's bribery/fraud scheme, the Court notes that Petitioners Lucaj and Quagliata were not among them.

[6]  8 C.F.R. § 208.24(a)(1) provides,

> An asylum officer may terminate a grant of asylum made under the jurisdiction of an asylum officer or a district director if following an interview, the asylum officer determines that there is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted.

8 C.F.R. § 208.24(c) provides,

> Prior to the termination of a grant of asylum or withholding of deportation or removal, the alien shall be given notice of intent to terminate, with the reason thereof, at least 30 days prior to the interview specified in the paragraph (a) of this section before an asylum officer. The alien shall be

5

> Our office has obtained evidence that indicates fraud in your application for asylum such that you were not eligible for asylum at the time it was granted. In May 2000, Supervisory Asylum Officer John Shandorf was convicted in United States District Court in the Eastern District of New York of bribery and conspiracy in his handling of asylum cases. In that investigation, the individual who claims to have prepared your application for asylum indicated that he used a portion of the money he received from you to pay Mr. Shandorf to assure a positive outcome on your asylum application. This individual has also stated that he prepared fraudulent asylum applications and encouraged applicants to fabricate elements of their claims. In addition, there is evidence in your case that Mr. Shandorf was, in fact, involved in the processing of your asylum application by the New York Asylum Office.

*See United States v. Lucaj*, E.D. Mich. No. 09-14716 ("*Lucaj I*"), Dkt. # 20-9.

The NOIT provided Plaintiffs 30-days notice to appear for an interview to respond to the adverse information. Lucaj appeared and was interviewed on September 7, 2005 in the Chicago Asylum Office of the USCIS. (Lucaj's husband did not appear.) After interviewing Lucaj, Asylum Officer Amanda Atkinson concluded that Lucaj was ineligible at the time she was granted asylum. *See* AO Atkinson's Memo to File, Petitioner's Ex. D. In relevant part, AO Atkinson's interview memo states as follows:

> Subject appeared at the terminations interview with her attorney, Mr. Carl M. Weiderman, III. Subject's husband, a dependent on the case, who had been instructed to appear at the interview did not appear. . . . Subject conducted her terminations interview in English and testified to being

---

> provided the opportunity to present evidence showing that he or she is still eligible for asylum or withholding of deportation or removal. If the asylum officer determines that the alien is no longer eligible for asylum or withholding of deportation or removal, the alien shall be given written notice that asylum status or withholding of deportation or removal and any employment authorization issued pursuant hereto, are terminated.

competent in writing and reading English after working in the United States and taking ELS [sic; ESL] courses.

Subject testified that the contents of her I-589 application for asylum filed on March 14, 1997 were correct and true.  She testified to filling out her application with the assistance of a friend in Yonkers, New York to whom she told her story verbally in Albania[n] and who then filled out the application.  Subject could not recall the name of her friend and stated she did not pay for her services.  Subject did not know why no information appears on her I-589 application regarding the identity of the person who assisted her in preparing the application. At the asylum interview in 1997 subject testified to bringing an interpreter with the last name Ismajmaj, a neighbor in New York who translated for free [at her original asylum interview]. The interpreter's name on the applicant/interpreter oath from May 6, 1997 is Vladimir Smojloj [sic; Smajlaj] with a Bronx, New York address.[7]  Either the information at the terminations interview was willfully incorrect or the interpreter sought to conceal his identity from the US government because of his involvement with the conspiracy to commit fraud.

When asked if subject was living in New York at the time she filed for asylum in 1997 she testified yes and relayed her address as:  595 Mecklane Apartment #1, Yonkers, NY 10705.  According to the I-589 filed in 1997 her street name was McClean and the apartment was #F.  Subject testified to living at that address in New York with her husband until after they were granted asylum on June 17, 1997, then moving to Michigan.  CIS reports show that subject's husband filed his application for work authorization the day after being granted asylum, June 18, 1997. . . indicating a current Michigan address.  Subject explained that they were already planning to move to Michigan.  In the investigation conducted into Luigi Berishaj's perpetration of asylum fraud he indicated that when living outside the jurisdiction of the New York Asylum Office[] where Mr. Shandorf worked[,] applicant's [sic; applicants] were instructed to use the address of a friend or relative who lived in Yonkers or other New York burrows.

Subject denied any knowledge of ever knowing a Luigi Berishaj.  Subject

---

[7]  Smajlaj was also charged with asylum fraud based on his involvement in Shandorf's bribery/fraud scheme.  However, after a jury trial Smajlaj was acquitted.  *See United States v. Smajlaj*, E.D.N.Y. No. 99-cr-1050.

stated no one ever suggested a story to her for asylum nor did she pay anyone in connection with her asylum application preparation or interpretation.  When asked if applicant was familiar with the allegation that Mr. Berishaj had been paid to assure her case would be granted she testified yes but [said] it was not true.

* * *

In reviewing subject's file it appears that the Asylum Officer's Assessment was clearly altered.  The heading states it is an Assessment to Refer and the credibility paragraph clearly indicates that subject was found not credible.  In clear contradiction to these statements, the final assessment goes on to grant asylum.  Based on the information from the investigation into Mr. Shandorf regarding the changing of decisions, subject[']s assessment was altered, albeit poorly, to reflect a grantable case.

A preponderance of the eviden[ce] suggests that there was [a] conspiracy to commit fraud in subject's asylum application.   Subject's testimony to briefly discuss her asylum case at the terminations interview calls into question whether harm she might have experienced in Albania[] w[as] on account of the same protected characteristic she asserted in 1997, religion.  In summarizing her claim for asylum subject mentioned religion but by probing further it appears problems she may have experienced were related to her husband being Italian as they were both Catholic and not on account of religion.  Moreover, subject's testimony, coupled with the fraud conviction of Mr. Shandorf in 2000 indicates that her application and testimony at her 1997 asylum interview contained elements [of] adverse credibility on material issues.

Based on the above, subject was ineligible at the time she was granted asylum due to fraud.  It is therefore recommended that subject's asylum status be terminated and subject referred to the Immigration Judge.

[Petitioners' Ex. D.]

While the issue of the termination of their asylum status was still unresolved, on

May 5, 2007, Petitioners filed applications for naturalization.  They were both

interviewed on their naturalization applications on April 2, 2008 in Detroit.  The

8

interviews were conducted without the benefit of Petitioners' administrative files ("A-files") which, at the time, were still in the Chicago Asylum Office. *See* Declaration of USCIS Senior Immigration Officer Ian Modelski, *Lucaj I*, Dkt. # 20-14. Although Petitioner Quagliata passed the history and government of his interview, his application was withheld pending receipt of his A-file. *Id.* Lucaj, however, failed the history and government portions on her first attempt; therefore, her interview was rescheduled for August 7, 2008. *Id.* She passed on her second attempt on August 7, 2008, and was accordingly, "recommended for approval," but because her A-file, like her husband's, was still in Chicago and, as a result, had not yet been reviewed, no final decision on her application was made. *Id.*

Meanwhile, while Petitioners were attempting to obtain naturalization through the Detroit USCIS office, on July 15, 2009, the Chicago Asylum Office terminated Petitioners' asylum status. *See id.,* Dkt. # 19-3; 19-4. Petitioners were notified of the termination that same date. *Id.,* Dkt. # 20-14. In this notice, the USCIS listed the reasons for its decision, including Lucaj's inconsistencies and lack of credibility in her September 2005 interview and fraud in Petitioners' procurement of asylum status. *Id.,* Dkt. # 19-4. On the same date, Chicago Asylum Officer Amanda Perkett prepared Petitioners' files for forwarding to Detroit "for revocation of both individuals' LPR status and placement into removal proceedings thereafter based on the finding of fraud and resulting termination of their status in the United States." *Id.*, Dkt. # 20-13. The files, were

9

accordingly forwarded to Detroit with instructions to issue Petitioners a Notice to Appear in Removal Proceedings. *Id.*

However, before the Detroit office had the opportunity to issue the Removal Notice or adjudicate the pending naturalization applications, on December 3, 2009, Petitioners filed a lawsuit in this Court seeking a declaratory judgment to award them naturalization based on the USCIS's failure to make a determination on their applications within 120 days of their naturalization examination as provided under 8 U.S.C. § 1447(b). *See Lucaj I*, Dkt. #1, Petition for Hearing on Naturalization Under 8 U.S.C. § 1447(b). It was during the pendency of this action, on February 8, 2010, that the USCIS rendered its decision denying Petitioners' naturalization, citing lack of good moral character arising out of the Petitioners' commission of fraud in obtaining asylum as the basis for its denial. In its decision, the USCIS stated, in relevant part:

> On September 7, 2004 [sic; 2005], you appeared for an interview regarding your asylum status.
>
> On August 5, 2005, USCIS issued you a Notice of Intent to Terminate your Asylum Status. This notice informed you that evidence had been obtained that indicated fraud in your application for asylum such that you were not eligible for asylum at the time it was granted.
>
> On July 15, 2009, you were issued a Notice of Termination of your Asylum Status. Again, USCIS informed you that it obtained evidence that indicated fraud in your application for asylum such that you were not eligible at the time it was granted. It was further noted that during the investigation into bribery and conspiracy of Supervisory Asylum Officer John Shandorf, you were implicated by co-conspirator Luigi Berishaj. Mr. Berishaj indicate that he used a portion of money he received from you to pay Mr. Shandorf for a favorable outcome in your asylum case.

> As a result of the review of the entire file, USCIS has concluded that you failed to establish that you are[] individual[s] of good moral character because you obtained your asylum through fraud.  Additionally, because your asylum was obtained through fraud you cannot establish that your previous admission as a permanent resident was lawfully obtained or was made in accordance with all applicable provisions of the law.  Accordingly, your application[s] for Naturalization [are] denied.  This decision is made without prejudice toward the filing of a new application should you meet the above requirements.

*Id.*, Dkt. # 11-3; 11-4.

On June 28, 2010, Petitioners were issued Notices to Appear ("NTAs") for Removal Proceedings.  Based upon its February 2010 decision and the subsequent NTAs, the USCIS moved to dismiss Petitioners' 2009 action as moot.  The Court, however, determined that, because no NTA was pending at the time that Petitioners filed their Complaint for a declaratory judgment on their naturalization, it had exclusive jurisdiction over Petitioners' naturalization applications.  *See Lucaj v. Dedvukaj*, 749 F. Supp. 2d 601, 613 (E.D. Mich. 2010).  Therefore, it determined that the USCIS's February 2010 decision denying Petitioners' naturalization applications had no effect, and held that the agency's decision should, at best, be treated as "tentative."  *Id.*  However, because, at the time of the hearing on the USCIS's motion to dismiss, Petitioners were already in removal proceedings, the Court recognized that it could not proceed to naturalize Petitioners.  *Id.*  Accordingly, the Court determined that the matter should be remanded to USCIS for proper adjudication of Petitioners' naturalization applications.  *Id.* at 614.

Following this Court's remand, on March 23, 2011, Petitioners instituted another

11

federal lawsuit, this time contesting the termination of their asylum status as arbitrary and capricious under the Administrative Procedures Act, 5 U.S.C. § 701, *et. seq. See Lucaj v. Dedvukaj*, E.D. Mich. No. 11-11172 ("*Lucaj II*").  However, six months later, on September 12, 2011, the parties stipulated to the dismissal of that case, without prejudice, so that Petitioners could focus on the adjudication of their naturalization applications. *See id.,* Dkt. # 14.

On November 19, 2010, now vested with proper jurisdiction, the USCIS, denied Petitioners' naturalization applications.  Petitioners requested review of their denied applications under 8 U.S.C. §1447(a).  On March 1, 2012, the USCIS Reviewing Officer affirmed the denial of both Petitioners' applications.  On June 25, 2012, Petitioners then filed the instant action for judicial review pursuant to 8 U.S.C. § 1421(c).

<u>THE USCIS REVIEWING OFFICER'S DECISION</u>

USCIS Reviewing Officer Michael Klinger determined that Petitioner Lucaj failed to meet the requirements of good moral character based upon inconsistent testimony given in at least four interviews and the evidence contained in her file indicating that she had obtained asylum through fraud.  Specifically, the Reviewing Officer noted the following:

> You entered the United States through fraudulent means on or about January 18, 1997.  In March of 1997 you applied for asylum based on religious persecution.  On May 6, 1997 you were interviewed by an asylum officer and were found not credible during the interview.  On June 17, 1997, you were granted asylum status at the New York Asylum office, which employed John Shandorf, a Supervisory Asylum Officer.  Shandorf

12

was later convicted for bribery and conspiracy in his handling of asylum cases.

* * *

. . .  On August 5, 2005 you were issued a Notice of Intent to Terminate Asylum.  On or about September 7, 2005, you were interviewed by the Chicago Asylum office.

On July 15, 2009, the Chicago asylum office determined there was enough evidence to terminate your asylum status.  The Chicago asylum office served you with notice (when) terminating your asylum status.  The termination stated that there was a question where you were living at the time your asylum was granted. . . .  The most crucial part of the Notice of Termination is that you were implicated by Luigj Berishaj a co-conspirator of John Shandorf.  Berishaj specifically stated that a portion of the money he received from you was given to Shandorf for a favorable decision.

On June 25, 2007, you filed for naturalization based on your five year residency as a lawful permanent resident.  On November 19, 2010 your application for Naturalization was denied.  On December 13, 2010 you filed an appeal of that decision by filing the Form N-336 request for a hearing on a decision in naturalization proceedings.

On October 17, 2011 you appeared for an interview on your N-336 hearing. At the interview a detailed statement was taken from you.  The testimony that you gave at your initial asylum interview in New York, your termination of asylum interview in Chicago on September 7, 2005 and the October 17, 2011 N-336 interview were all similar, but the story specifics differed from interview to interview.

On October 17, 2011 you stated that you entered the United States through Canada, remained in Michigan for one day and then traveled to New York. Your application for asylum states that you entered the United States through JFK airport in New York, NY with fraudulent documents.  A clear inconsistency.

You further stated that you continued to live in New York until being granted asylum.  You stated that after having your asylum granted your uncle had set up a place for you and your husband in Michigan.  You stated

13

that since you filed for asylum in New York, you knew that you could not leave until your case was completed.

The record reflects that your husband, a derivative of your asylum, filed for work authorization on June 18, 1007, just one day after you were granted asylum with a Michigan address.  The record indicates that an approval notice was mailed to you, not even giving enough time for the postal ser5vice to deliver the notice to you.  Yet again, how would he know to file for employment authorization if you had not known your asylum was going to be granted.

At your original asylum interview, you stated that you married your husband in Italy in 1994 where you remained until October of 1996 when you returned to Albania.  At the October 17, 2011 N-336 interview you stated that you left Albania in 1993 to travel to Italy and get married.  You stated that you traveled back to Albania[] about 11 months later, in 1994, a clear contradiction of testimony.

At the October 17, 2011 N-336 interview you stated that you were jailed for about one week and that you remained in Albania for about a month after being released, contradictory to your statement at the asylum interview.  At your asylum interview you stated that you were jailed four 15 days and that you remained in Albania for 2 days and left for Italy with your mother.  A clear contradiction of testimony.

On October 17, 2011 you were questioned about the process you followed applying for asylum.  You stated that you met a woman through work while cleaning houses and that this woman offered to help...fill out papers.  You stated that you told the woman your story and that the woman had her husband fill out the paperwork and she brought it back to work for you to sign.  You were unable to tell the interviewing officer this woman['s] name or her husband's name.  You stated that you had given her all of your personal information such as date of birth and full name after the paperwork was filled out.  You stated at the termination interview that you verbally told a man your story and that you met with him a couple of times, maybe three.  This is a clear contradiction of testimony.

You also stated that when you appeared for your asylum interview, the same woman or her husband was supposed to translate for you but had never showed up.  You then stated that you were approached by a young

14

male that asked if you were Albanian and asked if you needed his help. You stated that this was the first time you had met Smajlaj. You stated that he translated for you during your interview and that you had offered him $100 in exchange for his translating. This information contradicts your testimony at the asylum termination interview on September 7, 2005. At the termination interview you stated that your interpreter, Smajlaj[,] was a neighbor's friend and that you had brought him with you to the asylum interview. This again is a clear contradiction of testimony.

At your N-336 interview you claimed that you were raped multiple times over the course of your detention while in Albania. You stated that you never told anyone because you did not want your husband to know. During the interview you stated that your husband did not remain in the interview room with you. You could have clearly told the asylum officer at the time but you did not. The N-336 interview was the first time this was mentioned to any USCIS officer.

The testimony given at the time of your asylum interview, the termination interview and your N-336 interview all differ. Although the testimony given at the N-336 interview appeared to be consistent, it lacked consistency when compared to a review of your past testimony.

It has [also] been determined that your file contains fraud. The file contains evidence that is consistent with Shandorf cases. The pages that contain inconsistencies of the testimony at your initial asylum interview are missing. The file does not contain all the officer notes taken during the interview. your name was specifically mentioned in an internal investigation report. Your name was given by the facilitator, Berishaj in the Shandorf cases. You stated that you did not know who Berishaj is and that you had never met this person.

Complaint, Ex. A, Dkt. # 1-2.

After weighing the foregoing evidence, the Field Office Director Klinger

concluded:

You entered the United States by fraudulent means. You applied for asylum in New York, NY while living in Michigan. You were named specifically by Berishaj, a co-conspirator of John Shandorf[,] of giving him

15

money to assure that your asylum was granted by the New York asylum office.  your testimony given on three different occasions of such life changing events such as being married, your travels to other countries, being jailed, beaten and raped were all different.

The record reflects that you and your spouse have three USC children.  You appear to have no criminal record in the United States.  It appears that both you and your spouse have been gainfully employed in the United States since your arrival.

Based on the positive and negative equities contained within the file, it appears that the negative equities outweigh the positive.  A thorough review of the file USCIS finds that you have failed to provide evidence that you are a person of good moral character and that your adjustment of status was valid at the time of entry.

* * *

[A]n applicant for naturalization must demonstrate good moral character during the five years immediately preceding the date of application until the date citizenship is obtained.  Further, acts committed prior to the statutory period can be considered.  Such acts are evaluated in order to determine their relevance and to determine whether there has been a failure on the part of an applicant to reform character.  In light of this requirement, matters surrounding your grant of asylum are deemed relevant to an evaluation of your overall character.  It is also proper to consider the answers that you provided at any earlier interviews while seeking an immigration benefit.

* * *

The record indicates that you have provided inconsistent testimony throughout your interviews.  The record further reflects that you have sought to procure immigration benefits through fraudulent means.  This precludes USCIS from finding that you are a person of good moral character.  Your asylum status was terminated thus making you inadmissible at entry because you admission was based on asylum.

You do not appear to meet the requirements for naturalization and the appeal filed on your behalf will be denied.

16

*Id.*

As Quagliata's asylum status was obtained as a derivative of his wife's status, the Reviewing Officer also determined that fraud found in connection with Lucaj's asylum terminated Quagliata's asylum status, as well, and also rendered him ineligible for naturalization. *See Quagliata v. Dedvukaj*, E.D. Mich. No. 12-12781, Dkt. # 1-2.[8]

---

[8] Reviewing Officer Klinger also noted that Quagilata, himself, had given testimony under oath at his N-336 hearing which Klinger found "to not be credible and conflicting with the evidence contained in [his] file as well as [his] spouse's file." *Quagliata*, Dkt. # 1-2. Klinger elaborated:

> You were requested to appear at an interview by the USCI[S] Chicago Asylum Office on August 5, 2005. You never appeared for this interview. On October 17, 2011 there was a sworn statement given by you. During the statement you indicated you were arrested in Albania. When questioned as to when you stated that you did not remember. You were further questioned about the events surrounding your claimed arrest. You stated that you did not remember the time it happened, not even the year and that you believe it was in the Spring, maybe. You further stated that you were passing from one city to the next and that you believe it was by train. You further stated that you were held for one maybe two days but when pressed for a certain time you were held you stated only one day. You stated that while you were held in Albania you were beaten. You stated that when you were released you went to your spouse's family. When asked if your wife was held you stated yes I think so. When asked when [sic; whether] your wife was home already when you were released you stated I don't know. When asked how long you remained in Albania after your release from jail you stated that you don't remember.

> USCIS questions your credibility. During your spouse's interview she described that you and her [sic; she] were arrested after arriving on a boat in Durres, a clear contradiction to your story of being detained while on a train. During your spouse's interview she stated that she was kept for a week and that only after you and her family paid money for her was she released. She also stated that you both remained in Albania for a month after her release and then left for Italy. USCIS finds that such life changing

III. <u>DISCUSSION</u>

A.   <u>SCOPE AND STANDARD OF REVIEW</u>

Petitioners Lucaj and Quagliata filed their complaints in this matter after an

immigration officer reviewed, and affirmed, the denial of their naturalization applications.

Accordingly, they are entitled to seek judicial review of the reviewing officer's denials.  8

U.S.C. § 1421(c).[9]  "Such review shall be *de novo*, and the court shall make its own

---

events, such as being jailed in a foreign country would have remained an
event that you remember.  You were unable to describe even the year that
this event happened.  You stated that you were detained off a train, your
spouse stated off of a boat, a clear contradiction of testimony stemming
from the same event that is claimed to have taken place.

\* \* \*

. . . You have given false testimony to obtain a benefit.  The testimony was
made under oath or affirmation and with intent to obtain an immigration
benefit. . . .

 USCIS finds that [based on] your testimony coupled with the evidence
contained in the file, you fail to meet the requirements of good moral
character.

The record further reflects that you have sought to procure immigration
benefits through fraudulent means.  This precludes USCIS from finding
that you are a person of good moral character. . . .

*Id.*

[9]  Section 1421(c) provides:

A person whose application for naturalization under this subchapter is
denied, after a hearing before an immigration officer under section 1447(a)
of this Title, may seek review of such denial before the United States
district court for the district in which such person resides in accordance with
chapter 7 of Title 5.

18

findings of fact and conclusions of law and, shall, at the request of the petitioner, conduct a hearing *de novo* on the application." *Id.*

As the court observed in *Hassan v. Dedvukaj*, 2010 WL 199931 at *4 (E.D. Mich.2010), "This grant of authority is unusual in its scope -- rarely does a district court review an agency decision *de novo* and make its own findings of fact." *Id.* (quoting *Nagahi v. INS*, 219 F.3d 1166, 1169 (10th Cir.2000)).   Moreover, this Court's review "is not limited to any administrative record," and its decision "may be on facts established in and found by the district court *de novo*." *Hassan, supra* (quoting *Aparicio v. Blakeway*, 302 F.3d 437, 445 (5th Cir. 2002)).   Furthermore, it is proper to conduct this review within the context of a motion for summary judgment.   *Id.   See also Chan v. Gantner*, 464 F.3d 289, 295-96 (2d Cir. 2006) (rejecting an argument that § 1421(c) "implies a bench trial or evidentiary hearing" and thus precludes motions for summary judgment as a vehicle to obtain review of a denial decision); *Abulkair v. Bush*, 413 F. App'x 502, 508 n. 4 (3d Cir. 2011) (no requirement that the court hold oral argument before deciding motion for summary judgment on review of denial of naturalization);   *Cernuda v. Neufeld*, 307 F. App'x. 427, 431 n. 2 (11th Cir. 2009) (mandatory language in 1421(c) does not apply where standards for summary judgment are met); *Kariuki v. Torango*, 709 F. 3d 495, 501 (5th Cir. 2013) ("[W]e agree with our sister circuits that a "hearing *de novo*" within the meaning of Section 1421(c) encompasses an FRCP 56 review on summary judgment.").

---

8 U.S.C. § 1421(c).

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment."  *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).  The Court will apply the foregoing standards in deciding the motions for summary judgment in this case.

B.   PETITIONERS HAVE FAILED TO ESTABLISH THAT THEY ARE

ELIGIBLE FOR NATURALIZATION

After five years of continuous residence following lawful admission to permanent residence, an alien becomes eligible to apply for naturalization. 8 U.S.C. § 1427(a). A naturalization applicant must demonstrate, inter alia, good moral character; the ability to read, write and speak English; and a basic knowledge of United States history and government. See 8 U.S.C. § 1423(a), § 1427(a)(3). The applicant also has the burden of proving he was "lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1429.

The burden is on the person seeking naturalization to establish his or her eligibility. *Berenyi v. District Director, Immigration & Naturalization Serv.*, 385 U.S. 630, 637, 87 S. Ct. 666, 671 (1967); *Sakarapanee v. Department of Homeland Security*, 615 F.3d 595, 597 (6th Cir. 2010). This burden requires the applicant to prove, by a preponderance of the evidence, that he or she meets all of the requirements for naturalization and is thus eligible to become a citizen of the United States. *See* 8 C.F.R. § 316.2(b). Any doubts should be resolved in favor of the United States and against the applicant. *Berenyi* at 637, 87 S. Ct. at 671.

As an initial matter, to establish that they are eligible to naturalize, Petitioners have the burden of establishing that they were lawfully admitted to the United States for permanent residence. *See* 8 U.S.C. § 1429 (". . . no person shall be naturalized unless he has been *lawfully admitted to the United States for permanent residence* in accordance

21

with all applicable provisions of this Act.  The burden of proof shall be upon such person
. . . .”), and § 1427(a) (“No person. . . shall be naturalized unless such applicant has
resided continuously [for at least five years], after being *lawfully admitted for permanent
residence*.”) (Emphasis added).  Section 101 of  the INA defines the phrase “lawfully
admitted for permanent residence” as “the status of having been lawfully accorded the
privilege of residing permanently in the United States as an immigrant in accordance with
the immigration laws.”  8 U.S.C. §1101(a)(20).

Petitioners argue that although the agency terminated their asylee status, their
lawful permanent resident status remains untouched, and, therefore, they are entitled to
be naturalized.  However, Petitioners cannot meet their burden simply by showing that
they have permanent resident status.  “An alien who acquired permanent resident status
through fraud or misrepresentation has never been ‘lawfully admitted for permanent
residence.’”  *In re Koloamantangi*, 23 I. & N. Dec. 548, 550, 2003 WL 77728 (BIA
2003).

In *Koloamantangi*, the respondent obtained permanent resident status in 1985 by
virtue of his marriage to a United States citizen, which resulted in the birth of a child in
this country in 1988.  However, his marriage was bigamous, as he was married to a
Tongan national at the same time that he obtained LPR status based on his marriage to a
U.S. citizen.  The BIA held that, although the respondent was facially and procedurally in
lawful permanent resident status for more than the requisite number of years, he was

22

never, in a legal sense, an alien "lawfully admitted for permanent residence," because his acquisition of that status was procured by fraud.  *Id.* at 548-49.[10]

Several circuits have relied on *Koloamantangi*'s interpretation of "lawfully admitted for permanent residence" and have consistently held that to be "lawfully admitted for permanent residence" requires that the person have complied with the substantive legal requirements in place at the time he or she was admitted.  *See e.g., Matter of Longstaff*, 716 F.2d 1439 (5th Cir. 1983); *De La Rosa v. U.S. Dep't of Homeland Sec.*, 489 F.3d 551(2d Cir. 2007); *Savoury v. U.S. Att'y General*, 449 F.3d 1307, 1313 (11th Cir. 2006); *Arellan-Garcia v. Gonzales*, 429 F.3d 1183 (8th Cir. 2005). For example, in *Longstaff*, the court found the petitioner ineligible for naturalization even though he had originally entered the country under a proper visa and had been a permanent resident for 15 years, owned two reputable businesses in Texas, and had not been charged with any offenses other than traffic violations because he had engaged in homosexual activity prior to his entry in 1965, which was grounds for exclusion at that time.[11]

---

[10]  Accordingly, the BIA held that the respondent was ineligible for cancellation of removal, which required respondent to demonstrate that he had been lawfully admitted for permanent residence.  23 I. & N. Dec. at 549.

[11]  Prior to his entry, Longstaff filled out a form entitled "Application for Immigrant Visa and Alien Registration." One question on the form asked, "Are you now or have you ever been afflicted with psychopathic personality, epilepsy, mental defect, fits, fainting spells, convulsions or a nervous breakdown?" Longstaff answered, "No." The term "afflicted with psychopathic personality" was taken from 8 U.S.C. § 1182(a) (which has since been substantially revised) and was intended by Congress to designate homosexuals, as well as persons having psychopathic disorders, as that term is generally

23

Longstaff argued that because he had been granted a visa and admitted in procedurally regular fashion, he was eligible for naturalization even if, it turned out that, for any reason, he should have been excluded.  The court rejected that argument, explaining:

> That narrow reading of the term "lawfully admitted" distorts its meaning. Admission is not lawful if it is regular only in form. The term "lawfully" denotes compliance with substantive legal requirements, not mere procedural regularity, as the definition provided by Congress plainly establishes: "the term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws such status not having changed." Section 1429's added requirement "in accordance with all applicable provisions of [the Act]" is not merely redundant, but emphatic and embracive.

*Id.* at 1441-42 (footnotes omitted).

Similarly, in *De La Rosa*, the Second Circuit held that the petitioner, whose later testimony showed that she did not meet the requirements of an amnesty program through which she had obtained permanent residence had not been lawfully admitted for permanent residence.  489 F.3d at 555.  In *Arellano-Garcia*, the Eighth Circuit held that a person mistakenly granted permanent residence after unlawful reentry was not "lawfully admitted" despite the fact that there was no evidence that the alien committed fraud in obtaining that status.  429 F.3d at 1186.  Similarly, in *Savoury*, the Eleventh Circuit held that the petitioner, who was inadmissible due to a criminal conviction that he had

---

understood. 716 F.2d at 1440.  However, no evidence suggested that Longstaff knew or had reason to know that "psychopathic personality" was a term of art that included homosexuals and consequently excluded them from admission to the United States. *Id.*

disclosed during his application process, had not been lawfully admitted for permanent residence because he had been granted permanent residence as the result of a government error. 449 F.3d at 1316-17.

In this case, Petitioners obtained their LPR status as asylees. However, there is ample evidence of record supporting the USCIS's conclusion -- with which this Court agrees -- that Petitioner Lucaj's asylum status (and hence, her husband's derivative asylum status, as well) was obtained through fraud. Specifically, evidence has been presented establishing that Petitioner Lucaj's application for asylum was one of the applications implicated in John Shandorf's bribery fraud scheme. Evidence presented during Shandorf's trial specifically showed that Valbona Lucaj was one of the asylum applicants who had paid a substantial sum of money for favorable consideration of her asylum application. Luigi Berishaj, one of Shandorf's co-conspirators who testified at his trial, specifically identified Lucaj as one of the asylum applicants who had paid him to facilitate favorable treatment of her application. Berishaj testified that he kept some of the money but gave most of it to Shandorf.

Respondents additionally have presented the sworn Declaration of Patricia A. Menges, Director of the USCIS's New York Asylum Office, who has worked in that office since 1995 and is familiar with Shandorf and the circumstances of his criminal case. Based on Ms. Menges's review of the evidence in this case and her familiarity with the policies and procedures of the New York Asylum Office, Ms. Menges testified that

25

the records of this case show that the granting of Lucaj's application initially had not been recommended by the assigned Asylum Officer -- the AO actually had recommended Lucaj's referral to the IJ for placement in removal proceedings -- but the AO's Assessment and Referral was subsequently changed by Shandorf in the Refugee and Asylee Processing System from a referral for removal to a grant of asylum status.[12]

As the authorities discussed above demonstrate, Petitioners asserted specific lack of knowledge of Shandorf's fraudulent actions is of no import in the determination of whether Petitioners were "lawfully admitted for permanent residence." Substantial evidence has been presented showing that Lucaj's asylum status was obtained through fraud, and, Petitioners have not presented evidence showing otherwise.

## C.   PETITIONERS HAVE FAILED TO DEMONSTRATE SATISFACTION OF THE "GOOD MORAL CHARACTER" REQUIREMENT

Even if Petitioners are deemed to have been lawfully admitted, the record evidence establishes that they cannot satisfy the "moral character" requirement of § 1427(a)(3).

A naturalization applicant bears the burden of establishing, by a preponderance of the evidence, that he or she has been, and continues to be, "a person of good moral

---

[12]   The Court notes that Ms. Menges's testimony about Shandorf's altering of Lucaj's asylum application is consistent with testimony that was offered by the Government in Shandorf's prosecution as to the workings of Shandorf's scheme. *See United States v. Shandorf, supra*, Brief and Appendix of United States, 2001 WL 34284358.

26

character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." *Berenyi v. District Director,* 385 U.S. at 637; 8 U.S.C. § 1427(a)(3).  In determining whether the applicant has sustained this burden, the Court is not limited to the applicant's conduct during the five years preceding the filing of the application as with other requirements of § 1427(a)(3), but may also take into consideration as a basis for its determination, the applicant's conduct and acts at any time prior to that period.  8 U.S.C. § 1427(e).

While the INA does not define good moral character, it does provide a non-exhaustive list of instances in which a person is not to be regarded as having good moral character.  *See* 8 U.S.C. § 1101(f); 8 C.F.R. 316.10(b).  An applicant is deemed to lack good moral character if he or she has given false testimony for the purpose of obtaining an immigration benefit.  8 U.S.C. 1101(f)(6); 8 C.F.R. § 316.10(b)(1)(vi). Unless extenuating circumstances exist, the applicant also "shall also be found to lack good moral character if the applicant committed unlawful acts that adversely reflect upon the applicant's moral character," even if the applicant was not convicted or imprisoned for such acts.  8 C.F. R. § 316.10(b)(3)(iii).

With regard to false testimony, the subject matter of the false testimony is irrelevant, and it does not matter whether the false testimony was given to hide a fact that would actually disqualify an applicant from naturalization.  8 C.F.R. § 316.10(b) (2)(vi). Furthermore, false testimony is not rendered inconsequential due to its seemingly

27

innocuous nature. Rather, any testimony given under oath that is false can be used to show that the petitioner lacked good moral character, no matter how trivial or inconsequential. *See Kungys v. United States*, 485 U.S. 759, 780, 108 S. Ct. 1537 (1988).

A review of the evidence and the inconsistent -- and sometimes conflicting -- testimony Petitioners gave at various stages of the application process, demonstrates the correctness of the USCIS's conclusion that Petitioners provided false testimony in order to obtain an immigration benefit. For example, in her asylum application, Lucaj stated that she entered the United States through JFK airport with fraudulent documents. But, at her N-336 appeal interview, she stated that she entered the United States through Canada, remained in Michigan for one day, and then traveled to New York.

She also originally stated in her asylum interview that she married her husband in Italy on August 12, 1994 (as indicated on her marriage certificate) and remained in Italy with her husband until October 8, 1996 when she returned to Albania to visit her sick mother, but that she was immediately arrested when she got off a ferry from Italy to Albania. She said that she was the only person arrested because her name was on a list of people married to Italians and that she was thereafter held in jail for 15 days; then, two days, later she and her mother went back to Italy. She said she had been released from jail after her mother-in-law came and paid her jailers money.

Later in that same interview, however, Lucaj changed her story and said that she and her husband were married in Albania (she said she thought they got married in Tirana

28

but were never given a marriage certificate) and that she stayed in Albania until January 1997 then departed for the United States.  In her October 17, 2011 N-336 interview, she changed her story again and stated that she left Albania in 1993 to travel to Italy to get married then went back to Albania 11 months later.  She also stated for the first time at her N-336 interview that she had been beaten and raped multiple times over the course of her detention in Albania but never told anybody because she did not want her husband to know.

The Court agrees with the USCIS Reviewing Officer that the inconsistency of Petitioner Lucaj's testimony given on three different occasions of such life changing events such as being married, travels to other countries, and being beaten and raped indicate a lack of truthfulness.

Petitioner Quagliata's testimony presents even further inconsistencies.  Quagliata testified on October 17, 2011 that he was arrested in Albania while they were passing from city to city by train.  When pressed, however, Quagliata could not remember the events surrounding his claimed arrest, not even the year or time of year when it happened.  He further stated that after the arrest he was held for "maybe two days" but when pressed for a certain time stated it was only one day.  Quagliata further stated that after the arrest, he went to his wife's family.  When asked if his wife had also been detained he said, "yes, I think so," but could give no details.  When asked whether his wife was home with her family already when he was released he said, "I don't know."

29

Further, when asked how long they had remained in Albania after the release from jail, Quagliata stated he did not remember.

Lucaj was also questioned at her asylum termination interview about the circumstances surrounding her application for asylum. Lucaj stated at the termination interview that she verbally told her story to a man that she had met two or three times before, and he filled out the asylum application forms for her. At her N-336 hearing, Lucaj told the interviewing officer that she had met a woman through work while cleaning houses and that this woman offered to help her fill out her papers. She said that she told the woman her story and that the woman had her husband fill out the paperwork and brought it back to work for her to sign. However, when questioned about their identity, Petitioner was not able to give the interviewing officer the woman's or her husband's name.

She also stated at the N-336 interview that when she appeared for original asylum interview, the same woman or her husband were supposed to translate for her but never showed up. She said she was then approached by a young man that offered his help and that this man was named "Smajlaj." She said Smajlaj translated for her and that she offered him $100 as compensation. However, at her asylum termination hearing on September 7, 2004, she stated that Smajlaj was a neighbor's friend and that she had brought him with her to the asylum interview.

The record evidence concerning Petitioner Lucaj demonstrates further

30

prevarication with regard Lucaj's relationship with Luigi Berishaj, Shandorf's middleman co-conspirator.  Though Lucaj stated several times that she did not know who Berishaj was and that she had never met him, in a letter she admitted signing that she sent to the Department of Homeland Security on July 27, 2009, she stated, "I knew nothing of the actions of ... Mr. Berishaj *who I only met once and knew only as Louie*." (Emphasis added).  Though it appears from the complete text of the letter (i.e., the sophistication of the language and the citations to legal authority contained within it) that Petitioner likely did not draft the letter herself (apparently it was prepared by her lawyer), she admitted she signed it, and the drafter could only have obtained information that Lucaj had met Berishaj once and knew him as "Louie" from her.

Based upon the Court's *de novo* review of the above evidence and the record as whole -- including the substantial evidence of record demonstrating that Petitioners' asylum status was obtained through fraud -- the Court agrees with the conclusion of the USCIS that the Petitioners have not established good moral character by a preponderance of the evidence.  Therefore, they have not carried their burden of establishing entitlement to naturalization.

<u>CONCLUSION</u>

For the foregoing reasons,

IT IS HEREBY ORDERED that Petitioners' Motion for Summary Judgment **Dkt. # 23]**  is DENIED.

31

IT IS FURTHER ORDERED that Summary Judgment is hereby GRANTED in

favor of Respondents.  Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED in its entirety.

Let Judgment be entered accordingly.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  March 31, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 31, 2014, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135